IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DIVISION OF WEST VIRGINIA
Wheeling Division

CRAIG A. BROWN,

    Plaintiff,

vs.      Case No. **5:20-CV-222 (Bailey)**

XTREME CYCLES OUTLET, LLC
d/b/a XTREME SUZUKI OF WASHINGTON COUNTY, and
BRANCH BANKING AND TRUST COMPANY
d/b/a SHEFFIELD FINANCIAL, n/k/a TRUIST BANK,

    Defendants.

> ELECTRONICALLY FILED
> **10/09/2020**
> U.S. DISTRICT COURT
> Northern District of WV

## COMPLAINT

COMES NOW the Plaintiff, Craig A. Brown, by counsel, who for his Complaint against the Defendants, Xtreme Suzuki of Washington County and Branch Banking and Trust Company d/b/a Sheffield Financial, alleges as follows:

### PRELIMINARY STATEMENT

1. This is an action for actual, statutory and punitive damages, costs and attorney's fees brought pursuant to the Fair Credit Reporting Act and state law.

2. The jurisdiction of this Court is conferred by 15 U.S.C. § 1681(p) and 28 U.S.C. 1331. The Court has supplemental jurisdiction of the state law claims regarding the same transaction and events under 28 U.S.C. § 1367.

### PARTIES

3. The Plaintiff is a natural person and resident of the State of West Virginia and is a "consumer" as defined by 15 U.S.C. § 1681a(c).

4.	The Defendant, Branch Banking and Trust Company d/b/a Sheffield Financial ("BB&T") and k/n/a Truist Bank, is a North Carolina state banking corporation doing business in West Virginia. It has a principal place of business at 200 West Second Street, Winston-Salem, North Carolina 27101-4019.

5.	The Defendant, Xtreme Cycles Outlet, LLC d/b/a Xtreme Suzuki of Washington County ("Xtreme"), is a Pennsylvania limited liability company with its principal place of business at 1126 N Route 40 PO Box 143 Claysville, PA 15323. Xtreme does business in West Virginia and one or more of its members/owners is a resident of Ohio County, West Virginia.

**FACTS**

6.	On or about July 3, 2018, Plaintiff Craig Brown purchased an ATV from Xtreme for personal, family or household purposes by way of a consumer credit contract.

7.	During the purchase process, Plaintiff Craig Brown provided Defendants' employee and/or agent, personal and confidential information including, but not necessarily limited to, Plaintiff Craig Brown's social security number, income information, driver's license(s), banking account information and other important, personal and confidential information.

8.	Upon information and belief, Plaintiff Craig Brown's personal and confidential information was saved into Xtreme's database and/or operating system without prudent and appropriate safeguards permitting employees and/or agents of Xtreme to access Plaintiff's personal and confidential information at times unrelated to the specific purchase made by the consumer. Further, upon information and belief, Xtreme did not maintain prudent and appropriate safeguards to secure its customers' hard copy files, which permitted employees and/or agents of Xtreme to access its customers', including Plaintiff's, personal and confidential information at times unrelated to specific purchase made by the consumer.

9. Upon information and belief, at some time on or before July 3, 2018, Defendant Xtreme hired Anthony D. Long as a sales agent for consumer sales of ATVs and similar products.

10. Mr. Long was the salesperson responsible for the sale of the ATV to the Plaintiff.

11. Upon information and belief, Mr. Long and other employees were not properly supervised or monitored by Defendant Xtreme with respect to the database system or the hard copy files as referenced in paragraphs above.

12. Upon information and belief, Mr. Long and other salespersons receive commissions and bonuses for completed sales transactions.

13. At all relevant times, Mr. Long and other employees of Xtreme were acting as agents of Xtreme within the scope of their employment and furthering the interest of Xtreme. At times, they were also acting as agents of BB&T and furthering the interest of BB&T.

14. On or around October 11, 2018, Xtreme sold another ATV to Hunter C. Scott by way of a consumer credit agreement with an amount financed of $10,838.94.

15. Strangely, Plaintiff Craig A. Brown was also listed as a borrower and cosigner on a Sheffield Financial Note and Security Agreement ("loan contract") dated October 11, 2018.

16. Craig A. Brown did not authorize this transaction and does not even know Hunter C. Scott.

17. Upon information and belief, at some time on or before October 11, 2018, Mr. Long or another employer of Defendant Xtreme accessed the database system and/or hard copy files belonging to Plaintiff as referenced above.

18. In accessing this database system and/or hard copy files Defendant Xtreme accessed Plaintiff's personal and confidential information including, but not necessary limited to, Plaintiff's social security numbers, income information, banking information and other important,

personal and confidential information.

19. On or about October 11, 2018, Defendants used Plaintiff's information as contained in Defendant Xtreme's database system and/or hard copy files to make the subject loan without Plaintiff's consent or knowledge.

20. Defendants are subscribers and users of consumer reports.

21. In order to make this loan to Hunter C. Scott, Defendants used their access to information stored by one or more credit reporting agency and accessed Plaintiff's credit profile.

22. The referenced inquiry has become a component of the Plaintiff's credit profile and is reported to those who ask to review the credit history of the Plaintiff.

23. Upon best information and belief, Defendants as "Users" agreed and represented in its agreements with the various credit reporting agencies that they would request and use consumer reports which were obtained from said agencies only for purposes which are lawful under the FCRA as defined under § 1681b.

24. Defendants were required pursuant to FCRA §§ 1681q, 1681n and 1681o to refrain from obtaining consumer reports from credit reporting agencies under false pretenses.

25. At no relevant time, including in October of 2018, did Plaintiff have a relationship of any kind with Defendants as defined under FCRA § 1681b (3)(A)-(E).

26. Plaintiff has not knowingly given written instructions to Defendants to obtain and/or release to a third party a consumer report of which Plaintiff was the subject; nor have Defendants been ordered by a court of competent jurisdiction to issue a consumer report pursuant to FCRA § 1681b(1).

27. Defendants have an affirmative duty to follow reasonable procedures, including those that would prevent the impermissible accessing of consumer reports.

28. Reasonable procedures for users include restricting the ability of its agents to obtain consumer reports on consumers for any impermissible purpose.

29. Upon best information and belief, Defendants' illegal and surreptitious acquisition of Plaintiff's credit reports derived from an interest and priority well beyond the scope of the FCRA.

30. Defendants have, upon best information and belief, compromised their relationship with the various credit reporting agencies in falsifying the basis upon which Plaintiff's report was obtained.

31. Defendants have compromised Plaintiff's access to credit in imparting to past, present and future credit grantors that Plaintiff has applied for credit in tandem with a relationship with Defendants.

32. The acts and omissions committed by Xtreme and its employees as alleged herein were committed within the scope of the actual and/or apparent agency relationship with Defendant BB&T, who authorized Xtreme to deal with customers and take loan applications on its behalf.

33. The acts and/or omissions giving rise to this complaint arose out of a "joint venture" and/or "civil conspiracy" as such terms have been defined by the common law between Xtreme and BB&T.

34. After the loan was made to Hunter C. Scott, BB&T continued to falsely report the debt as owed by Craig A. Brown to the credit reporting agencies, including Experian, Transunion and Equifax.

35. Plaintiff did not begin to discovery the above scheme until he was denied pre-approval for a home purchase in March of 2019 due to the inappropriate reporting of a fraudulent tradeline by BB&T/Sheffield.

36. Thereafter, Plaintiff began a lengthy credit dispute process.

37. He first disputed the BB&T debt with Experian.

38. Experian reported the results of its reinvestigation to Craig Brown on March 25, 2019. It stated that BB&T certified to Experian that the information it was reporting was accurate. Accordingly, no changes were made to the false reporting by Defendant BB&T.

39. On or around May 5, 2019, Plaintiff submitted dispute letters with the credit reporting agencies Transunion, and Equifax.

40. Upon information and belief, each of Plaintiff's dispute letters was forwarded to Defendant BB&T by the respective credit reporting agencies.

41. On or around May 6, 2019, Plaintiff disputed the debt in writing directly with BB&T/Sheffield Financial following a telephonic dispute. Plaintiff requested any account records that he allegedly signed.

42. Equifax reported the results of its reinvestigation to Craig Brown on May 13, 2019. It stated that BB&T verified its reporting as accurate. Accordingly, no changes were made to the false reporting by Defendant.

43. Transunion reported the results of its reinvestigation to Craig Brown on May 15, 2019. It stated that BB&T verified its reporting as accurate. Accordingly, no changes were made to the false reporting by Defendant.

44. BB&T reported the results of its investigation to Craig Brown on May 14, 2019. It stated that BB&T determined "the account belongs to you and we have closed this dispute." It provided no documentation to Mr. Brown at this time despite his request.

45. On or around June 12, 2019, Plaintiff again submitted dispute letters with the credit reporting agencies Transunion, Experian and Equifax. This time Plaintiff included an identity theft

affidavit confirming the account at issue did not belong to him.

46. Upon information and belief, each of Plaintiff's dispute letters and affidavits were forwarded to Defendant BB&T by the respective credit reporting agencies.

47. On or around June 20, 2019, Equifax placed a fraud alert on the account.

48. On or around June 21, 2019, Experian placed a security alert on the account.

49. On or around June 23, 2019, Transunion placed a fraud alert on the account.

50. Equifax reported the results of its reinvestigation to Craig Brown on June 27, 2019. It stated that BB&T verified its reporting as accurate. Accordingly, no changes were made to the false reporting. However, Equifax added a comment to the tradeline: "Consumer Disputes – Reinvestigation in Process."

51. Equifax also continued to report the October 11, 2018 credit inquiry from Sheffield Financial.

52. Transunion reported the results of its reinvestigation to Craig Brown on June 22, 2019. It correctly deleted the tradeline for the subject account.

53. Experian reported the results of its reinvestigation to Craig Brown on June 26, 2019. It indicated the account at issue was already removed.

54. On or around August 21, 2019, Plaintiff again disputed the debt in writing directly with BB&T/Sheffield Financial and asked for an explanation of its decision to report the account as owed by him.

55. BB&T responded by letter dated September 10, 2019 and again concluded "the account belongs to you and we have closed this dispute." This time it provided loan documentation showing that Mr. Brown's signature had been forged on the Note and Security Agreement, the Notice to Cosigner, and the Buyers Order. All dispute related letters referenced herein were sent to and from

Plaintiff's home in Marshall County, West Virginia.

56. Upon information and belief, Defendant BB&T failed to conduct lawful investigations and, upon information and belief, unlawfully and wrongfully verified the reporting as accurate. Upon information and belief, Defendant BB&T continues to falsely report the subject debt though certain credit reporting agencies may be blocking its reports.

57. As of September 21, 2020, Equifax, and perhaps other credit reporting agencies, are still reporting the false and unauthorized credit inquiry from October 2018 as described above which adversely affects Plaintiff's credit rating.

58. As a direct and proximate result of the wrongful conduct of the Defendants, the Plaintiff has suffered financial losses, consequential damages and has had to secure the services of legal counsel.

59. As a direct and proximate result of the wrongful conduct of the Defendants, the Plaintiff has suffered annoyance, aggravation, inconvenience and emotional distress.

60. As a direct and proximate result of Defendants' misconduct as described above, the Plaintiff has suffered adverse actions and consequences in credit related transactions or in the ability to enter into credit related transactions.

61. Plaintiff further requests appropriate equitable relief, including, but not limited to, Defendants modifying their data security measures to conform with applicable laws and standards.

## COUNT I
### Violations of the Fair Credit Reporting Act
### 15 U.S.C. §§ 1681b

62. Defendants/Users willfully and/or negligently violated the provisions of the FCRA in the following respects:

    (a) Defendants have falsely, purposely, surreptitiously and maliciously obtained the Plaintiff's credit reports in violation of FCRA § 1681q.

    (b)    Defendants have falsely, purposely, surreptitiously and maliciously obtained the Plaintiff's credit reports in violation of FCRA § 1681n.

    (c)    Defendants have obtained the Plaintiff's credit reports in violation of FCRA § 1681o.

63. The FCRA establishes very specific rules placing limitations upon an entity (or "person") seeking to obtain a consumer's credit history or the content of a consumer's credit file, as follows:

    (a)    Certain use or obtaining of information prohibited.—A person shall not use or obtain a consumer report for any purpose unless—

    (b)    The consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and

    (c)    The purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

See 15 U.S.C. § 1681b(f).

64. Section § 1681b(a)(3) of the FCRA lists the all-inclusive purposes for which a consumer report can be obtained, as follows:

    (a)    In General — . . . [A] consumer reporting agency may furnish a consumer report under the following circumstances and no other:
    * * *
    (3)    To a person which it has reason to believe—
    (A)    intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or
    * * *
    (F)    otherwise has a legitimate business need for the information—(i) in connection with a business transaction that is initiated by the consumer; or (ii) to review an account to determine whether the consumer continues to meet the terms of the account.

65. Defendants did not have any permissible purpose as set forth under the FCRA.

66. Defendants had actual knowledge that they had no permissible purpose to obtain Plaintiff's credit information.

67. For Defendants to access the consumer credit history of a consumer whom is known by it to not have any account with Defendants constitutes willful non-compliance with the FCRA.

9

68. As a direct and proximate result of Defendants' willful conduct as outlined above, Plaintiff is entitled to actual or statutory damages, plus punitive damages and reasonable attorney's fees together with the costs of this action as provided by 15 U.S.C. § 1681n.

69. Alternatively, the impermissible access of Plaintiff's credit information constitutes a negligent violation as set forth in 15 U.S.C. § 1681o. In this regard, Plaintiff is entitled to recover his actual damages in an amount to be proven at trial, plus attorney's fees together with the costs of this action

## COUNT II
### Violations of the Fair Credit Reporting Act
### 15 U.S.C. §§ 1681s-2(b) (Against Defendant BB&T)

70. Plaintiff re-alleges and incorporates paragraphs above as if fully set out herein.

71. Defendant BB&T willfully and/or negligently violated 15 U.S.C. § 1681s-2(b) by failing to conduct reasonable investigations upon receiving notice of Plaintiff's disputes, and/or by failing to appropriately report the results of its investigations, and/or by failing to appropriately modify, delete, and/or block the information.

72. As a result of this conduct, action and inaction of Defendant, the Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from credit; and the mental and emotional pain, anguish, and embarrassment.

73. Defendant's conduct, action and inaction was willful, rendering it liable for actual or statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent entitling the Plaintiff to recover actual damages under 15 U.S.C. 1681o.

74. The Plaintiff is entitled to recover costs and attorney's fees from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT III
### Breach of Fiduciary Duty (Against Defendant Xtreme)

75. The foregoing paragraphs are re-alleged as if set forth here fully.

76. By entering into a contractual relationship whereby the Plaintiff was required to provide private and confidential information, Defendant Xtreme, assumed the role of a fiduciary and was charged with a duty to safe keep that information.

77. By causing the release of the Plaintiff's private and confidential information, the Defendant Xtreme is guilty of a breach of its fiduciary duty.

78. As a direct and proximate result of the breach of fiduciary duty by the Defendant Xtreme, the Plaintiff suffered the injuries, damages and losses referenced herein.

## COUNT IV
### Negligence

79. The foregoing paragraphs are re-alleged as if set forth here fully.

80. Defendants have a duty to exercise due care in the methods used to safe keep the private and confidential information provided to it by clients, including the Plaintiff.

81. Defendants breached this duty of care by using a system whereby any of their employees or agents could freely access a client's private and confidential information without accountability therefore.

82. It was foreseeable to Defendants that a failure to use reasonable measures to protect customer account information could result in injury to consumers and the Plaintiff.

83. Defendant BB&T is ostensibly and/or vicariously liable for the actions of its agent, Defendant Xtreme and for its failure to suitably perform its duty of care within the scope of its actual and/or apparent authority.

84. Also, Defendants had a duty to employ reasonable security measures under Section

5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to use reasonable measures to protect confidential consumer data.

85. Defendants' duty to use reasonable care in protecting account data arose not only as a result of the statutes and regulations, but also because Defendants are bound by industry standards.

86. Defendants' breached their duties, and thus were negligent, by failing to use reasonable measures to protect account information. Defendants' negligent acts and omissions include, but are not limited to, the following:

    (a) Failing to adopt, implement, and maintain adequate security measures to safeguard account information;
    (b) Failing to adequately monitor the security of Defendants operating network;
    (c) Allowing unauthorized access to Plaintiff's sensitive information;
    (d) Failing to detect in a timely manner that Plaintiff's information had been compromised; and
    (e) Failing to timely notify Plaintiff about the data breach so that he could take appropriate steps to mitigate the risk of identity theft and other damages.

87. Defendants had a duty to exercise due care in training and supervising their employees and agents.

88. Defendants breached this duty of care by failing to properly train and supervise their employees and agents in such a way that would have prevented them from accessing and using private and confidential information belonging to clients, including the Plaintiff.

89. Defendants had a duty to properly design and ensure operating systems, database systems and/or other software systems did not permit unfettered access to customer's personal and confidential information at times unrelated to the specific transaction requested by the consumer.

90. Defendants breached their duty by utilizing operating systems, database systems

and/or other software which permitted employees and/or agents to access Plaintiff's confidential information without authorization and when not being used for specific purpose of properly accessing personal and confidential information.

91. As a direct and proximate result of the breach of the duty of due care by the Defendants, herein and above alleged, the Plaintiff suffered the injuries, damages and losses set forth herein.

## COUNT V
### Unfair Trade Practices And Consumer Protection (Against Defendant Xtreme)

92. Plaintiff re-alleges and incorporate by reference all preceding allegations as if fully set forth herein.

93. Plaintiff is a "person" as defined at 73 Pa. Stat. § 201-2(2).

94. Plaintiff purchased goods and services in "trade" and "commerce" as defined at 73 Pa. Stat. § 201-2(3).

95. Plaintiff purchased goods and services primarily for personal, family, and/or household purposes under 73 Pa. Stat. § 201-9.2.

96. Defendant Xtreme engaged in "unfair methods of competition" or "unfair or deceptive acts or practices" as defined at 73 Pa. Stat. § 201-2(4) by engaging in the following conduct:

    (a) Representing that its goods and services had characteristics, uses, benefits, and qualities that they did not have – namely that its goods, services, and business practices were accompanied by adequate data security (73 Pa. Stat. § 201-2(4)(v));

    (b) Representing that its goods and services were of a particular standard or quality when they were of another quality (73 Pa. Stat. § 201-2(4)(vii));

    (c) Advertising its goods and services with intent not to sell them as advertised (73 Pa. Stat. § 201-2(4)(ix); and

(d) "Engaging in any other . . . deceptive conduct which creates a likelihood of confusion or of misunderstanding" (73 Pa. Stat. § 201-2(4)(xxi)).

97. These unfair methods of competition and unfair or deceptive acts or practices are declared unlawful by 73 Pa. Stat. § 201-3.

98. Defendant Xtreme's unfair or deceptive acts and practices include but are not limited to: failing to implement and maintain reasonable data security measures to protect account information; unfairly and deceptively misusing customer information to create a phony account; failing to identify foreseeable data security risks and remediate the identified risks; failing to comply with common law duties, industry standards, and FTC guidance regarding data security; misrepresenting in its privacy policy that it would protect account information; and omitting and concealing the material fact that it did not have reasonable measures in place to safeguard account information.

99. Defendant Xtreme's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy and fairness of its data security practices and ability to protect account information.

100. Defendant Xtreme intended to mislead consumers and induce them to rely on its misrepresentations and omissions. As set forth herein, Plaintiff relied on Xtreme's misrepresentations and omissions relating to its data privacy and security.

101. Plaintiff acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered with reasonable diligence.

102. Had Defendant disclosed to consumers that its data security systems were not secure and, thus, were vulnerable to theft or misuse for profit, Plaintiff would not have given his confidential information or data to Xtreme.

103. Xtreme acted intentionally, knowingly, and maliciously in violating the UTPCPL, and recklessly disregarded consumers' rights.

104. As a direct and proximate result of Xtreme's unfair methods of competition and unfair or deceptive acts or practices, Plaintiff suffered and will continue to suffer damages, injury, ascertainable losses of money or property, and monetary and non-monetary damages as described above.

105. Plaintiff seeks all monetary and non-monetary relief allowed by law, including the following as expressly permitted under 73 Pa. Stat. § 201-9.2:

   (a) "actual damages or [statutory damages of] one hundred dollars ($100), whichever is greater";

   (b) treble damages, defied as "three times the actual damages";

   (c) "reasonable attorney fees" and litigation costs; and

   (d) "such additional relief as [the Court] deems necessary or proper."

   (e) Plaintiff also seeks the injunctive relief.

## COUNT VI
### Invasion of Privacy

106. The foregoing paragraphs are re-alleged as if set forth here fully.

107. The Defendant, Xtreme, tortiously invaded the privacy of the Plaintiff by accessing his private and confidential information without his knowledge or consent.

108. The Defendants invaded the privacy of the Plaintiff by appropriating his identity, forging his signature, making a loan for the purchase of property that Plaintiff did not receive, and creating a new credit account – all without the Plaintiff's knowledge or consent.

109. As a direct and proximate result of the invasion of privacy by the Defendants, the Plaintiff suffered the injuries, damages and losses set forth herein.

## COUNT VII
### Fraudulent Concealment (Against Defendant Xtreme)

110. The foregoing paragraphs are re-alleged as if set forth here fully.

111. The Defendant Xtreme concealed from the Plaintiff the fact that it was accessing her private and confidential information, taking out loans in his name, appropriating confidential information, forging his signature, making a loan for the purchase of property that plaintiff did not receive, and creating a new credit account – all with the express intention of misleading or deceiving the Plaintiff.

112. The foregoing conduct constitutes the tort of fraudulent concealment.

113. As a direct and proximate result of the fraudulent concealment committed by the Defendant, the Plaintiff suffered the injuries, damages and losses set forth herein.

## COUNT VIII
### Punitive Damages

114. The foregoing paragraphs are realleged as if set forth here fully.

115. The conduct of the Defendants, hereinabove alleged, was done willfully, wantonly, recklessly and/or with complete indifference to their obligations under law.

116. The Plaintiff in addition to compensatory damages, should be awarded punitive and exemplary damages in an amount that will punish the Defendants for their wrongful conduct and will deter them and other similarly situated institutions and individuals from engaging in similar conduct in the future.

WHEREFORE, the Plaintiff respectfully requests that the Court enter judgment against the Defendants for all damages, penalties and relief alleged herein, together with pre and post judgment interest and attorney fees, and any other relief the Court deems just and proper.

**TRIAL BY JURY IS DEMANDED**.

           CRAIG A. BROWN, Plaintiff

By:  /s/ *Jason E. Causey*
    JASON E. CAUSEY #9482
    BORDAS & BORDAS, PLLC
    1358 National Road
    Wheeling, WV  26003
    (304) 242-8410
    jcausey@bordaslaw.com
    *Counsel for Plaintiff*